IN THE

# United States Court of Appeals for the Fourth Circuit

SUSANNAH WARNER KIPKE, et al.,
*Plaintiffs-Appellants / Cross-Appellees,*

*v.*

WES MOORE, et al.,
*Defendants-Appellees / Cross-Appellants,*

KATHERINE NOVOTNY, et al.,
*Plaintiffs-Appellants / Cross-Appellees,*

*v.*

WESLEY MOORE, et al.,
*Defendants-Appellees / Cross-Appellants.*

On Appeal from the United States District Court
for the District of Maryland
Nos. 1:23-cv-01293-GLR, 1:23-cv-01295-GLR

**JOINT BRIEF OF BRADY CENTER TO PREVENT GUN
VIOLENCE AND GIFFORDS LAW CENTER TO PREVENT
GUN VIOLENCE AS AMICI CURIAE IN SUPPORT OF
APPELLEES / CROSS-APPELLANTS**

Kelly M. Percival
GIFFORDS LAW CENTER TO
  PREVENT GUN VIOLENCE
268 Bush Street #555
San Francisco, CA 94104
(415) 433-2062
*Counsel of Record for Amicus
Curiae Giffords Law Center to
Prevent Gun Violence*

Thomas M. Bondy
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
(202) 339-8400
*Counsel of Record for Amicus
Curiae Brady Center to Prevent
Gun Violence*

*Additional counsel on inside cover*

Esther Sanchez-Gomez
GIFFORDS LAW CENTER TO
  PREVENT GUN VIOLENCE
268 Bush Street #555
San Francisco, CA  94104
(415) 433-2062

*Additional Counsel for Amicus
Curiae Giffords Law Center to
Prevent Gun Violence*

Douglas N. Letter
Shira Lauren Feldman
Tess M. Fardon
BRADY CENTER TO PREVENT GUN
  VIOLENCE
840 First Street, N.E., Suite 400
Washington, DC 20002

Melanie R. Hallums
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY  10019

Holly J. Boux*
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
* *Not licensed in the District
of Columbia; practice is
under the supervision of bar
members pursuant to D.C.
App. R. 49(c)(8).*

*Additional Counsel for Amicus
Curiae Brady Center to Prevent
Gun Violence*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1799 (L)__     Caption: __Kipke, et al. v. Moore, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Brady Center to Prevent Gun Violence__
(name of party/amicus)

_____

who is _____Amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
   If yes, identify all such owners:

**i**

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Thomas M. Bondy          Date:          12/27/2024

Counsel for: Brady Center to Prevent Gun Violence

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. ___24-1799(L___        Caption: ___Kipke, et al. v. Moore, et al.___

Pursuant to FRAP 26.1 and Local Rule 26.1,

___Giffords Law Center to Prevent Gun Violence___
(name of party/amicus)

_____

who is _____Amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2. Does party/amicus have any parent corporations?  ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
   If yes, identify all such owners:

**iii**

12/01/2019 SCC

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Kelly M. Percival Date: 12/27/2024

Counsel for: Giffords Law Center to Prevent Gun Violence

iv

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENTS...........................................i

TABLE OF AUTHORITIES...................................................vi

INTEREST OF *AMICI CURIAE*.................................................1

INTRODUCTION AND SUMMARY ......................................2

ARGUMENT..................................................................5

    I.    Under *Bruen*, Maryland's Firearms Restrictions Should Not Be Subjected To An Overly Stringent Test........5

        A.    Maryland's restrictions on firearms in State parks, school grounds, and museums are presumptively lawful under *Bruen*'s first step.............5

        B.    *Bruen*'s second step requires a historical inquiry, not a historical match. ...............................................7

        C.    Maryland's restrictions on firearms in State parks, school grounds, and museums pass muster under *Bruen*'s second step. ........................................ 10

    II.    The Second Amendment Cannot Override First Amendment Rights. .........................................25

CONCLUSION.....................................................................35

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antonyuk v. James,*
120 F.4th 941 (2d Cir. 2024)........................................... 12, 14, 15, 21

*District of Columbia v. Heller,*
554 U.S. 570 (2008)..................................................... 6, 14, 15

*Hague v. C.I.O.,*
307 U.S. 496 (1939)........................................................30

*Kipke v. Moore,*
695 F. Supp. 3d 638 (D. Md. 2023) ......................................... 17, 24, 25

*Kleindienst v. Mandel,*
408 U.S. 753 (1972)........................................................28

*Martin v. City of Struthers,*
319 U.S. 141 (1943)........................................................28

*McDonald v. City of Chicago,*
561 U.S. 742 (2010)....................................................... 6

*McDonald v. Smith,*
472 U.S. 479 (1985)........................................................26

*Md. Shall Issue, Inc. v. Montgomery Cnty.,*
680 F. Supp. 3d 567 (D. Md. 2023) ......................................... 13, 16

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
597 U.S. 1 (2022)...........................3, 5, 6, 7, 8, 9, 14, 15, 16, 25, 26, 30

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
460 U.S. 37 (1983).........................................................30

*Rocky Mountain Gun Owners v. Polis,*
121 F.4th 96 (10th Cir. 2024) ............................................. 6

*Rossignol v. Voorhaar,*
316 F.3d 516 (4th Cir. 2003) ....................................................... 28

*Stanley v. Georgia,*
394 U.S. 557 (1969) ..................................................................... 28

*United States v. Rahimi,*
602 U.S. 680 (2024) ........................................ 3, 4, 5, 6, 7, 8, 9, 16, 25

*Warren v. Fairfax Cnty.,*
196 F.3d 186 (4th Cir. 1999) ...................................................... 30

*We the Patriots USA, Inc. v. Grisham,*
No. 23-cv-773, 2023 WL 6377288 (D.N.M. Sept. 29, 2023) ................ 21

*Wolford v. Lopez,*
116 F.4th 959 (9th Cir. 2024) ...................................................... 21

**Constitutional Provisions**

U.S. Const. amend I ............................... 4, 5, 25, 26, 27, 28, 31, 32, 33, 34

U.S. Const. amend. II ... 2, 3, 4, 5, 6, 7, 8, 10, 15, 18, 22, 25, 26, 30, 31, 34

U.S. Const. amend. XIV ........................................ 7, 12, 18, 19, 30, 34

**Statutes**

Maryland's Gun Safety Act of 2023 ......................................................... 4

Md. Code, Crim. Law § 4-111(a)(2)(ii) (2023) ........................................ 16

Md. Code, Crim. Law § 4-111(a)(8)(iii) (2023) ....................................... 25

Md. Code Regs. 08.07.06.04 .................................................................... 16

Md. Code Regs. 14.39.07.06 .................................................................... 17

**Other Authorities**

*Armed Assembly: Guns, Demonstrations, and Political
Violence in America,* Everytown Research & Policy (Aug.
23, 2021), https://tinyurl.com/4p2838f7 ............................................ 32

Dessa Bergen-Cico et al., *Community Gun Violence as a Social Determinant of Elementary School Achievement*, 33 Social Work in Pub. Health 439 (2018) ..........................................17, 28

Joseph Blocher & Reva B. Siegel, *Guided by History: Protecting the Public Sphere from Weapons Threats Under Bruen,* 98 N.Y.U. Rev. 1799 (Dec. 2023) ...............................................26

Marika Cabral et al., *Trauma at School: The Impacts of Shootings on Students' Human Capital and Economic Outcomes*, Nat'l Bureau of Econ. Rsch. (2024), https://tinyurl.com/35xcb9zc........................................17, 28

Decl. of Daryl Anthony, *Kipke v. Moore*, No. 23-cv-1293 (D. Md. July 28, 2023), Dkt. No. 21-7...............................................19, 20

Decl. of Terri Lee Freeman, *Kipke v. Moore*, No. 23-cv-1293 (D. Md. July 28, 2023), Dkt. No. 21-11........................................23, 27

Decl. of Leah Glaser, *May v. Bonta*, Nos. 23-cv-1696, -1798 (C.D. Cal. Nov. 3, 2023), Dkt. No. 21-4 ...............................18, 19, 20

Decl. of Anita Kassof, *Kipke v. Moore*, No. 23-cv-1293 (July 28, 2023), Dkt. No. 21-8 ..................................................................23

Decl. of Carter Arnot Polakoff, *Kipke v. Moore*, No. 23-cv-1293 (D. Md. July 28, 2023), Dkt. No. 21-10....................................24

Decl. of Mark J. Potter, *Kipke v. Moore*, No. 23-cv-1293 (D. Md. July 28, 2023), Dkt. No. 21-9...............................................22, 27

Decl. of Professor Terence Young, *May v. Bonta*, Nos. 23-cv-1696, -1798 (C.D. Cal. Nov. 3, 2023), Dkt. No. 21-13..................12, 13

Expert Report and Decl. of Saul Cornell, *Kipke v. Moore*, No. 23-cv-1293 (D. Md. July 28, 2023), Dkt. No. 21-3. ........... 10, 11, 12, 30

Dahlia Lithwick & Mark Joseph Stern, *The Guns Won*, Slate (Aug. 14, 2017), https://tinyurl.com/2zetvdwv ..................................32

Tori Luecking, *DHS Launches Panel on Religious Security as Hateful Incidents Rise*, Wash. Post (Nov. 3, 2022), https://tinyurl.com/2m4rcanv ........................................................... 33

Gregory P. Magarian, *Conflicting Reports: When Gun Rights Threaten Free Speech*, 83 Law & Contemp. Probs. 169 (2020)........................................................................................ 31

Md. Park Serv., *2024 Signature Events*, https://tinyurl.com/kf45tk8s (last visited Dec. 18, 2024) ................... 29

Md. Park Serv., Dep't of Nat. Res., *Statewide Park Programs*, https://tinyurl.com/37f7d84x (last visited Dec. 17, 2024) ........................................................................................ 20

Darell A. H. Miller et al., *Technology, Tradition, and "The Terror of the People,"* 99 Notre Dame L. Rev. 1373 (2024) ............... 32

Reginald F. Lewis Museum of Maryland African American History & Culture, *Events Calendar*, https://tinyurl.com/mpkp2s8y (last visited Dec. 17, 2024) ............... 28

Bertrall L. Ross II, *Polarization, Populism, and the Crisis of American Democracy*, 20 Ann. Rev. L. & Soc. Sci. 293 (2024)........................................................................................ 33

Kari Still et al., *The History and Tradition of Regulating Guns in Parks*, 19 Harv. L. & Pol'y Rev. 201 (2024)................... 11, 12

Tolly Taylor, *I-Team: Parents Concerned About Man With Assault Rifle at School Bus Stop*, WBALTV (May 18, 2023), https://tinyurl.com/4bybns4d............................................... 32

David Welch, *Michigan Cancels Legislative Session to Avoid Armed Protesters*, Bloomberg (May 14, 2020), https://tinyurl.com/53e9unpz.......................................................... 32

Christopher Wiggins, *Proud Boys Terrorize Drag Queen Story Hour in Nevada*, Advocate (June 30, 2022), https://tinyurl.com/yfweb46m.......................................................... 32

Arnold Woods, *Birth of the Playground: A Closer Look*, OpenSFHistory, http://tinyurl.com/4y76wuxp (last visited Dec. 17, 2024) ...............................................................................18

## INTEREST OF *AMICI CURIAE*[1]

This brief is filed by *amici* Brady Center to Prevent Gun Violence (Brady) and Giffords Law Center to Prevent Gun Violence (Giffords Law Center).  These organizations are committed to reducing the gun violence that pervades the United States.

Founded in 1974, Brady is a nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, legal advocacy, and political action.  Brady works to free America from gun violence by passing and defending gun violence prevention laws, reforming the gun industry, and educating the public about responsible gun ownership.

Giffords Law Center is a nonprofit organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others seeking to reduce gun violence and improve community safety. It was formed in 1993 by a group of attorneys after a shooting at a San Francisco law firm and renamed in 2017 after joining forces with the

---

[1] The parties have consented to the filing of this *amicus* brief.  No counsel for a party authored the brief in whole or in part.  No party, counsel for a party, or any person other than *amici* and their counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

1

gun-safety organization led by former Congresswoman Gabrielle Giffords. Through partnerships with gun violence researchers, public health experts, community organizations, gun owners, and law enforcement officials, Giffords Law Center researches, drafts, and defends laws, policies, and programs proven to reduce gun violence.

*Amici* have a shared interest in reducing gun violence to protect the lives of all Americans, and they bring extensive expertise regarding firearms regulations and gun violence in the United States. *Amici* have a substantial interest in ensuring the Constitution is correctly interpreted to allow for effective, common-sense gun violence prevention measures fully consistent with the Second Amendment. In this brief, which focuses on State parks, school grounds, and museums, *amici* show that Maryland's firearms restrictions, which limit firearms in certain sensitive places, are consistent with the principles underpinning the history and tradition of the nation, including core values of free speech and civic engagement.

## INTRODUCTION AND SUMMARY

The Supreme Court has held that responsible law-abiding citizens have a right to carry firearms for the purpose of lawful self-defense, but

it has emphasized that the right is not unlimited.  In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Court explained that courts should undertake a text-and-history analysis when considering constitutional challenges to gun-safety regulations.  597 U.S. 1, 17, 39 (2022); *see also United States v. Rahimi*, 602 U.S. 680, 691 (2024).

The analysis begins with a threshold inquiry, identifying the relevant activity and asking whether the plain text of the Second Amendment protects that activity.  If yes, the analysis then proceeds to an inquiry comparing modern and historical laws.  Recognizing that modern regulations often will not have a corresponding "historical *twin*," the Court endorsed an approach that allows for analogical reasoning, where courts assess whether modern gun regulations maintain the "balance struck by the founding generation" and later generations, including around the time of Reconstruction.  *Bruen*, 597 U.S. at 29–30 & n.7; *see Rahimi*, 602 U.S. at 692.

*Bruen*'s second step does not require modern regulations to precisely match a historical analogue.  As the Court recently underscored in *Rahimi*, the law is not "trapped in amber" and "the Second Amendment permits more than just those regulations identical

to ones that could be found in 1791." 602 U.S. at 691–92. The critical question in addressing a gun-safety law's constitutionality is "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692. Accordingly, courts must look to the purposes behind historical regulations—the "why"— and the methods used by those regulations—the "how"—to inform their analysis. Under this analysis, Maryland's Gun Safety Act of 2023 and other challenged firearms regulations pass constitutional muster. This brief shows that the district court was correct in upholding Maryland's laws restricting the carrying of firearms in State parks, school grounds, and museums.

This case also raises important issues regarding the intersection of the First and Second Amendments. Protection of First Amendment rights, such as the right to free speech and assembly, can justify firearms restrictions in appropriate venues. Thus, another reason that firearms can be restricted in designated civic locations, such as parks and museums, is because of the important First Amendment activity that takes place there. The presence of firearms in these public places

4

threatens a chilling effect on the exercise of critical First Amendment rights.

## ARGUMENT

### I. Under *Bruen*, Maryland's Firearms Restrictions Should Not Be Subjected To An Overly Stringent Test.

In *Bruen*, the Supreme Court set out a text-and-history test for evaluating the constitutionality of firearms regulations. 597 U.S. at 17. Under step one of the *Bruen* analysis, courts must determine whether the plain text of the Second Amendment covers an individual's conduct. If it does, then the court proceeds to step two, where "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*; *Rahimi*, 602 U.S. at 691.

#### A. Maryland's restrictions on firearms in State parks, school grounds, and museums are presumptively lawful under *Bruen*'s first step.

*Bruen*'s first step requires plaintiffs to establish that the Second Amendment's plain text encompasses their "proposed course of conduct." *Bruen*, 597 U.S. at 32. Here, Plaintiffs' proposed course of conduct includes bringing firearms onto school grounds, and into museums and certain areas of State parks. This conduct falls outside the Second Amendment's protections. From *Heller* to *Rahimi*, the

Court has confirmed that certain "longstanding" regulations, including "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," are "presumptively lawful." *District of Columbia v. Heller*, 554 U.S. 570, 626–27 & n.26 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010); *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring); *Rahimi*, 602 U.S. at 735 (Kavanaugh, J., concurring).

Restrictions on firearms in sensitive places such as schools and government buildings—which are analogous to museums and government-run state parks (*see infra*, at 10–25)[2]—are "presumptively lawful," and this Court may uphold them under *Bruen*'s first step. *See Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 118–21 (10th Cir. 2024) (upholding age-based restrictions on firearm purchases as outside the Second Amendment's scope because the Supreme Court has repeatedly affirmed that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful" (quoting *Heller*, 554 U.S. at 626–27)).

---

[2] *See Heller*, 554 U.S. at 627 n.26 ("We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.").

## B. *Bruen*'s second step requires a historical inquiry, not a historical match.

*Bruen*'s second step requires courts to determine whether modern gun regulations are "relevantly similar" to historical regulations, particularly to those in effect around the time that the Second and Fourteenth Amendments were ratified (1791 and 1868, respectively). *Bruen*, 597 U.S. at 26–29; *Rahimi*, 602 U.S. at 692. If modern regulations are sufficiently analogous to historical regulations, they pass constitutional muster.

At the outset, the *Bruen* Court instructed that modern regulations must be "*consistent with* this Nation's historical tradition of firearm regulation." 597 U.S. at 17 (emphasis added). A modern regulation is "consistent" with this historical tradition if it is "analogous" to—and not necessarily a "twin" of or "dead ringer for"—historical regulations. *Id.* at 30 (emphasis omitted). When explaining the analogical method required, the Court identified two relevant metrics: the "how" and the "why" of the regulation's effect on Second Amendment rights. *Id.* at 29. If the "how" and "why" are comparable to historical regulations, then the regulation is in keeping with "the balance struck by the founding

7

generation," and is constitutional. *Id.* at 29 n.7; *Rahimi*, 602 U.S. at 692.

Determining whether a gun regulation's "how" and "why" are in keeping with this balance requires courts to identify and apply the relevant concerns that the legislatures considered. On one side, for example, is the overarching governmental interest in protecting public safety, which is part of what *Bruen* calls the regulation's "why." *See* 597 U.S. at 30. On the other side is the way in which the regulation limits Second Amendment rights to achieve that interest, which is what *Bruen* calls the regulation's "how." *Id.* at 29. Courts must evaluate these considerations and determine whether the modern and historical laws are sufficiently analogous. *Id.* at 28–30; *Rahimi*, 602 U.S. at 692.

*Bruen* requires an *analogical* inquiry, not a one-to-one match or other more rigid method of comparison. Indeed, the decision recognized the substantial differences between the circumstances faced by 18th-, 19th-, and even early-20th-century legislatures, and those faced by legislatures today. 597 U.S. at 27; *see Rahimi*, 602 U.S. at 691 (decrying recent judicial interpretations of the Supreme Court's Second Amendment cases that would "suggest a law trapped in amber").

Technological and societal changes have drastically altered the harms that elected representatives must address with firearms regulations. More than 150 years ago and before, there was nothing close to the gun violence epidemic present in modern America.

The greater the "unprecedented societal concerns or dramatic technological changes" addressed by modern government regulations, the more critical it is to use what the Court called a "more nuanced approach" to the analogical inquiry. *Bruen*, 597 U.S. at 27; *see also Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring) ("[I]mposing a test that demands overly specific analogues has serious problems. To name two: It forces 21st-century regulations to follow late-18th-century policy choices, giving us 'a law trapped in amber.' And it assumes that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority." (citation omitted)). And the *Bruen* Court acknowledged the validity of a major, historical concern: protecting public safety in sensitive places. *See* 597 U.S. at 30. This is exactly what Maryland seeks to do through its firearms restrictions—protect public safety by restricting firearms in

specifically designated sensitive places—just as past governments have historically and traditionally done.

### C. Maryland's restrictions on firearms in State parks, school grounds, and museums pass muster under *Bruen*'s second step.

**1. State Parks.** Historical evidence shows that guns have been restricted in public parks for as long as such parks have existed. Plaintiffs nevertheless challenge Maryland's regulations restricting firearms in State parks, State forests, and Chesapeake Forest Lands. But the records in this case and other recent cases establish an overwhelming historical practice of restricting firearms in these and similar venues, which confirms the constitutionality of these regulations post-*Bruen*.

For example, Professor Saul Cornell, the Paul and Diane Guenther Chair in American History at Fordham University, submitted an expert declaration in this case describing the history of firearms restrictions in public parks. *See* Expert Report and Decl. of Saul Cornell, *Kipke v. Moore*, No. 23-cv-1293 (D. Md. July 28, 2023), Dkt. No. 21-3 (hereinafter Cornell Decl.). Professor Cornell explained that "[t]here were no modern-style parks in the era of the Second

Amendment." Cornell Decl. ¶ 54. During that time, "the nation was still 90% rural and [the] majority of the population was engaged in agricultural pursuit," *id.*, so there was no need for designated public green spaces. "The creation of parks as we now know them began in the middle of the nineteenth century," when they became "places of refuge from the congestion, grime, and stresses of city life." *Id.* ¶ 55. In the post-Civil War period, "[t]he expansion of urban parks, the creation of new state parks, and eventually the involvement of the federal government in land preservation intensified." *Id.*

Crucially, firearms were not allowed in any of these parks, whether city, state, or federal. "From the outset the regulations governing these spaces prohibited firearms." *Id.* ¶ 59. "[W]hen parks were created, prohibitions on carrying guns were adopted at the same time." Kari Still et al., *The History and Tradition of Regulating Guns in Parks*, 19 Harv. L. & Pol'y Rev. 201, 222 (2024).

Indeed, millions of Americans "lived under a firearms regulatory regime that prohibited firearms in parks." Cornell Decl. ¶ 56. And this made perfect sense: Public parks were viewed as "places of relaxation, repose, and recreation," and "there was little disagreement that state

11

and local governments had the authority under the police power to regulate and prohibit guns in parks." *Id.* ¶¶ 55–56. Thus, "limits on arms in public parks was the norm in America in the era of the Fourteenth Amendment." *Id.* ¶ 56.

There are dozens of historical examples of local restrictions on guns in parks. *See* Appellees' Br. 38–39. As the Second Circuit recently explained, "eight examples (Chicago, Detroit, New York City, Philadelphia, Pittsburgh, Salt Lake City, St. Paul, St. Louis)" amply "establish[] a municipal tradition of regulating firearms in urban public parks." *Antonyuk v. James*, 120 F.4th 941, 1022 (2d Cir. 2024); *see also id.* at 1016–17 n.77 (citing ordinances). These include some of the oldest and most iconic public parks in the country—*e.g.*, Manhattan's Central Park, Brooklyn's Prospect Park, Philadelphia's Fairmount Park, and San Francisco's Golden Gate Park. *See* Still, *supra,* at 221–26 nn.169–94 (citing dozens of regulations enacted from the 19th to early 20th century restricting guns in public parks).

And while "[m]ost state parks … did not appear until the Twentieth Century …, they came to be seen as the logical extension between city or county parks and national parks." Decl. of Professor

Terence Young ¶ 48, *May v. Bonta*, Nos. 23-cv-1696, -1798 (C.D. Cal. Nov. 3, 2023), Dkt. No. 21-13.  With the goal of "'plac[ing] recreational parks within the reach of every citizen,' … the National Park Service dramatically increased the number of state parks by building 800 between 1933 and 1942." *Id.* ¶ 50 (citation omitted).  As Professor Young, Emeritus Professor of Geography at California Polytechnic State University, Pomona, explained, he did not "discover any evidence of support for the carrying of firearms for self-defense in state parks." *Id.* ¶ 51.  "This would have been inconsistent with romantic and rationalistic ideals and antithetical to the social purpose of state parks …." *Id.*; *see Md. Shall Issue, Inc. v. Montgomery Cnty.*, 680 F. Supp. 3d 567, 586 (D. Md. 2023) (noting historical regulation of firearms in state parks).

Although Plaintiffs seek to limit the historical analysis to founding-era laws, later laws, such as the many ordinances restricting guns in public parks starting in the 1850s, are at least as relevant.  The Supreme Court has explained that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification" is "a critical tool of

13

constitutional interpretation." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 605). If post-ratification laws are consistent with prior ones, they can show a continuing tradition of regulation. *See id.* at 27 ("Following the course charted by *Heller*, we will consider whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." (quoting 554 U.S. at 631)).

As the Second Circuit recently explained, the prohibition of firearms in parks was a continuation of this country's "tradition of regulating firearms in historical public forums." *Antonyuk*, 120 F.4th at 1022. "As urban public parks took root as a new type of public forum," cities continued this tradition of restricting firearms "to likewise keep these new public spaces, urban parks, peaceable." *Id.* And none of those restrictions was invalidated by any court, nor is there any evidence of constitutional challenges to them. *Id.* "In other words, the ordinances were not merely adopted by legislative bodies in the respective cities in which they applied—they were apparently accepted without any constitutional objection by anyone." *Id.* Prohibiting firearms in public parks is therefore part of the "well-established,

representative, and longstanding tradition of regulating firearms in places that serve as public forums and, as a result, tend to be crowded." *Id.* at 1023.

*Bruen* makes clear that many modern regulations implicating Second Amendment rights will survive scrutiny under its analytical framework. The *Bruen* majority opinion emphasized that the "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check," and that many common regulations, such as restrictions on guns in sensitive places, can legally continue under *Bruen*. 597 U.S. at 30. Likewise, the *Bruen* concurrences emphasized the Court's narrow focus. Justice Alito noted that the opinion "decides nothing" about who may lawfully possess a gun, what requirements must be met to purchase a gun, or the kinds of guns that people may possess. *Id.* at 72 (Alito, J., concurring). And Justice Kavanaugh, joined by Chief Justice Roberts, summarized that, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.* at 80 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636).

The majority in *Bruen* clearly intended many modern gun laws to survive its test. *See* 597 U.S. at 38 n.9; *accord Rahimi*, 602 U.S. at 691−92. Maryland's restrictions on carrying firearms in State parks decisively pass muster given the history of public parks and gun regulation canvassed above.[3]

**2. Schools, School Grounds, and Playgrounds.** Maryland's restrictions on carrying firearms on school grounds[4] similarly pass constitutional muster.

As an initial matter, Maryland's ban on carrying firearms in school buildings is plainly constitutional. *See Bruen*, 597 U.S. at 30 (identifying schools and government buildings as sensitive places warranting firearms restrictions). For similar reasons, prohibiting the carrying of firearms on school grounds is also constitutional. Schools and their surrounding grounds are critical sites of education, physical and social development, and community life for young people. Feeling

---

[3] *See, e.g.*, Md. Code Regs. 08.07.06.04 (barring individuals other than law enforcement officers from possessing weapons in State parks, with limited exceptions for designated shooting ranges and licensed hunters during hunting season); *Md. Shall Issue, Inc.*, 680 F. Supp. 3d at 586 (observing that Minnesota and Wisconsin passed similar restrictions over a century ago).

[4] Md. Code, Crim. Law § 4-111(a)(2)(ii) (2023).

safe in and around school is essential for students' learning and development.[5] As the district court recognized, "school grounds are plainly analogous to school buildings, and therefore the grounds may also be designated as sensitive places." *Kipke v. Moore*, 695 F. Supp. 3d 638, 660 (D. Md. 2023).

Playgrounds are one of the most common features of school grounds. *See, e.g.*, Md. Code Regs. 14.39.07.06 (requiring public elementary schools to have playgrounds). School playgrounds, in turn, are often used as community playgrounds. Maryland's ban on carrying firearms on school grounds, including on the playgrounds within them, is consistent not only with the tradition of banning firearms in schools, but also with the historical development of public playgrounds.

---

[5] *Cf.* Marika Cabral et al., *Trauma at School: The Impacts of Shootings on Students' Human Capital and Economic Outcomes*, Nat'l Bureau of Econ. Rsch. 1 (2024), https://tinyurl.com/35xcb9zc (finding association between exposure to a school shooting and increased absences, chronic absenteeism, grade retention, and reductions in high school graduation, college attendance, and college graduation rates); Dessa Bergen-Cico et al., *Community Gun Violence as a Social Determinant of Elementary School Achievement*, 33 Social Work in Pub. Health 439, 441 (2018) (observing association between children's indirect exposure to community violence and health functions that are "essential to learning").

Playgrounds—like public parks—did not exist at the enactment of the Second Amendment and began to appear only in the late 1800s. *See* Decl. of Leah Glaser ¶ 69, *May*, Nos. 23-cv-1696, -1798 (C.D. Cal. Nov. 3, 2023), Dkt. No. 21-4 (hereinafter Glaser Decl.) (Professor of History and Coordinator of the Public History Program at Central Connecticut State University). Indeed, "[d]esigners of mid-nineteenth century parks … did not initially include playgrounds in urban park planning, favoring passive recreation over active." *Id.* ¶ 70.

The concept of using parks more for active recreation and "play-centered activities" began in the late nineteenth century, shortly after ratification of the Fourteenth Amendment. *Id.* ¶¶ 69–70. "Sharon's Quarter"—a playground in San Francisco's Golden Gate Park—for example, was established in 1888. *Id.* ¶ 70; *see also* Arnold Woods, *Birth of the Playground: A Closer Look*, OpenSFHistory, http://tinyurl.com/4y76wuxp (last visited Dec. 17, 2024). Public playgrounds became ubiquitous throughout the nation thereafter. *See* Glaser Decl. ¶ 70.

As discussed above with respect to parks generally, firearms have been restricted in public parks from the very beginning and gun-free

18

parks were the norm in the era of the Fourteenth Amendment. And, playgrounds are common features of parks, and indeed are present in many Maryland State parks. *See* Decl. of Daryl Anthony ¶ 4, *Kipke*, No. 23-cv-1293 (D. Md. July 28, 2023), Dkt. No. 21-7 (hereinafter Anthony Decl.). Thus, the historical analogues of park regulations discussed above apply with at least equal force to playgrounds, including but not limited to those on school grounds.

While playgrounds developed in part as features of parks (in addition to community centers, school grounds, and other locations), they were created for a distinct purpose. "Progressive reformers formed the Playground Association of America (PAA) in 1906 and it was under their guidance that playgrounds established a moral code of child development with directed child-centered activities." Glaser Decl. ¶ 71. Formal public playgrounds began to appear in places like settlement houses, "located near tenements and poor immigrant worker neighborhoods," not only to support immigrant families, but also as a space for public education outside of traditional schooling. *Id.* ¶ 73.

The emergence of early playgrounds coincided with the emerging concept of "educating children through play," following in the footsteps

of German educational reformer Friedrich Fröbel's kindergartens in the early 1800s (featuring sand gardens to encourage the development of morally, mentally, and physically healthy children) and the opening of the first English-language kindergarten in the United States in the 1860s.  *Id.* ¶ 70.

Playgrounds, thus, were conceived and developed historically in the United States for educational and child-development purposes. They continue to be used for those purposes today.  Indeed, Maryland's playgrounds and parks are not only intended as safe spaces for children to play, but they are areas where educational activities are programmed and staffed.  Daryl Anthony, a longtime Maryland Department of Natural Resources employee, explained that "Maryland State parks offer programs geared toward school-age children, including arts and crafts programs, guided hikes, junior ranger programs, educational programs and nature presentations such as 'Scales and Tails.'" Anthony Decl. ¶ 5; *see also* Md. Park Serv., Dep't of Nat. Res., *Statewide Park Programs*, https://tinyurl.com/37f7d84x (last visited Dec. 17, 2024) (inviting public and school groups to participate in statewide

educational programs, including Reading in State Parks, Junior Rangers, and Project Butterfly & Bumblebee).

The Ninth Circuit recently explained the historical analogue. "Playgrounds did not exist in modern form at the time of the Founding (or even at Reconstruction); playgrounds are found primarily at schools and parks; both categories of places qualify as 'sensitive places' that have a historical tradition of firearm bans." *Wolford v. Lopez*, 116 F.4th 959, 985 (9th Cir. 2024). "[B]y extension," it continued, "there is a historical tradition of banning firearms at playgrounds." *Id.*; *see also Antonyuk*, 120 F.4th at 1017 n.78; *We the Patriots USA, Inc. v. Grisham*, No. 23-cv-773, 2023 WL 6377288, at *3 (D.N.M. Sept. 29, 2023).

Thus, because the Supreme Court has instructed that schools are "sensitive places" where firearms may be banned, the playgrounds of those schools are also sensitive places. And if school playgrounds are sensitive places, it follows that playgrounds in general are also sensitive places. *See, e.g.*, *Wolford*, 116 F.4th at 985 (concluding that playgrounds are a "sensitive place" where firearms can be prohibited). States, thus, can afford the same protections to children in playgrounds,

21

whether at parks or on school grounds, without offending Second Amendment rights.

3. **Museums.** Like parks, schools, and school grounds, museums play an important role in the education and development of children. As declarations from Maryland museum leaders show, museums design many of their exhibits and programs for children and host thousands of school children as visitors each year.

Mark Potter, the president of the Maryland Science Center in Baltimore, explained that the "mission of the Science Museum is educational," and it prominently features children's programs such as "interactive exhibits for children, a planetarium for astronomy gurus, and giant dinosaur replicas." Decl. of Mark J. Potter ¶ 3, *Kipke*, No. 23-cv-1293 (D. Md. July 28, 2023), Dkt. No. 21-9 (hereinafter Potter Decl.). The Science Museum hosts about 300,000 visitors each year, approximately 67% of whom are children, and regularly hosts groups of Maryland school children, with as many as 2,000 children inside the museum at one time. *Id.* ¶¶ 5–6.

Likewise, the executive director of the Reginald F. Lewis Museum of Maryland African American History & Culture in Baltimore (Lewis

Museum), stated that the museum hosts nearly 20,000 visitors a year, approximately one-third of whom are children, and regularly hosts groups of children from Maryland schools.  Decl. of Terri Lee Freeman ¶¶ 6–7, *Kipke*, No. 23-cv-1293 (D. Md. July 28, 2023), Dkt. No. 21-11 (hereinafter Freeman Decl.).  The museum features many exhibits and programs for children that "provide the historic view of Maryland's African American community that is not provided in most school settings."  *Id.* ¶ 4.

Anita Kassof, the executive director of the Baltimore Museum of Industry, similarly described how the museum highlights "the diverse and significant human stories behind labor and innovation in Baltimore."  Decl. of Anita Kassof ¶ 3, *Kipke*, No. 23-cv-1293 (July 28, 2023), Dkt. No. 21-8.  It features exhibits and programs of interest to children, including interactive exhibits and "several classrooms designed for hands-on engagement," where "museum staff regularly demonstrate working machinery and printing equipment for school groups."  *Id.* ¶ 4.  The Museum of Industry hosts about 45,000 visitors per year; approximately 19,400 are children, and many visit as part of groups from Maryland schools.  *Id.* ¶¶ 6–7.

Along the same lines, the president of the Port Discovery Children's Museum in Baltimore explained that the museum specifically designed many of its exhibits and programs for children. For example, it features "hands-on, indoor activities designed for children to engage in imaginative learning and play." Decl. of Carter Arnot Polakoff ¶ 3, *Kipke*, No. 23-cv-1293 (D. Md. July 28, 2023), Dkt. No. 21-10. And, the museum "includes an indoor sports court, multiple role-playing exhibits, a giant pretend cargo ship, a water activity room, theater performances, innovative puzzles, interactive art studios and musical exhibits." *Id.* ¶ 4. The Port Discovery Museum hosts about 159,000 visitors per year, approximately 106,000 of whom are children. *Id.* ¶ 6. The museum also regularly hosts groups of Maryland school children, with as many as 350–500 students inside the museum at the same time during the school year and summer and 750–1,250 during weekends, holidays, and school breaks. *Id.* ¶ 7.

Based on these declarations, the district court correctly found that "museums are like schools because they serve an educational purpose and are often geared towards children," and are also "justified by the protection of children as a vulnerable population." *Kipke*, 695 F. Supp.

3d at 652.  Maryland's restrictions on firearms in museums[6] are

additionally "supported by a representative number of historical

statutes that demonstrate a historical tradition of firearm regulation in

places of gathering for education, literary, or scientific purposes."  *Id.*

Maryland's restrictions on carrying firearms in museums therefore pass

constitutional muster.  *See Bruen,* 597 U.S. at 24, 30; *Rahimi,* 602 U.S.

at 691.

## II.   The Second Amendment Cannot Override First Amendment Rights.

As explained above, the Supreme Court held in *Heller* and

reaffirmed in *Bruen* that firearms may be prohibited in "sensitive

places," including schools, legislative assemblies, government buildings,

polling places, and courthouses.  *Bruen,* 597 U.S. at 30; *see also id.*

(allowing courts to use analogies "to determine that modern regulations

prohibiting the carry of firearms in *new* and analogous sensitive places

are constitutionally permissible"); *Rahimi,* 602 U.S. at 735 (Kavanaugh,

J., concurring).  This is at least in part because many are places of civic

engagement, a core American value enshrined in the Constitution and

---

[6] Md. Code, Crim. Law § 4-111(a)(8)(iii) (2023).

25

long protected under the First Amendment. *See, e.g.*, *Bruen*, 597 U.S. at 30; *McDonald v. Smith*, 472 U.S. 479, 483 (1985) (noting that "the values in the right of petition as an important aspect of self-government are beyond question").

In recognizing the constitutionality of restrictions on firearms in sensitive places where people gather regularly and peacefully, the Supreme Court has confirmed that the Second Amendment is not to interfere with the government's ability to preserve our right to engage in civil discourse without being inhibited by the presence of weapons. Fundamentally, *Bruen*'s reaffirmation of the presumptive constitutionality of excluding firearms in "sensitive places" recognizes the government's authority to protect "a public sphere for democratic dialogue, democratic governance, and the reproduction of *democratic community* in which people can relate freely without intimidation or coercion." Joseph Blocher & Reva B. Siegel, *Guided by History: Protecting the Public Sphere from Weapons Threats Under* Bruen, 98 N.Y.U. L. Rev. 1795, 1799 (Dec. 2023). Maryland's State parks, school grounds, and museums are well within that public sphere.

Visiting a museum, for example, falls squarely into the First Amendment's protections of civic engagement. Museums present exhibits to the public for cultural and educational purposes. *See, e.g.*, Potter Decl. ¶ 3 (explaining educational mission of the Maryland Science Center); Freeman Decl. ¶ 4 (explaining educational programming at the Lewis Museum). The Lewis Museum is illustrative. Many of the Lewis Museum's programs are designed for children, and some of the museum's recent First Amendment events include:

| Date (2024) | Event |
| --- | --- |
| June 1, 8 | Indigo Village Dye Doll Workshops and Artist Talk with Kibibi Ajanku |
| June 19 | Juneteenth Celebration 2024 \| Freedom's Voices from Jubilee to Reparations |
| Sept. 14 | Black Women Book Chat: Words of Self-Healing with Authors Marita Golden, Bernadine Watson, and Michelle Petties |
| Sept. 20 | Lift Every Voice & Vote: Preserving Tomorrow's History \| Voter Registration Day |
| Oct. 12 | iWitness Media Youth Photography Club with Kyle Pompey |
| Nov. 1 | Maryland Emancipation Author Talk: Combee: Harriet Tubman, the Combahee River Raid, and Black Freedom during the Civil War with Dr. Edda L. Fields-Black |

| Date (2024) | Event |
| --- | --- |
| Nov. 5 | Election Night Viewing Party[7] |

Museum visitors have a First Amendment right to receive, access, and engage with this information. *See Kleindienst v. Mandel*, 408 U.S. 753, 762–63 (1972) ("It is now well established that the Constitution protects the right to receive information and ideas." (quoting *Stanley v. Georgia*, 394 U.S. 557, 564 (1969))); *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (same); *Rossignol v. Voorhaar*, 316 F.3d 516, 522 (4th Cir. 2003) ("[The First Amendment] protects *both* a speaker's right to communicate information and ideas to a broad audience *and* the intended recipients' right to receive that information and those ideas."). This right is impinged upon by the threat of firearm-related violence. As studies show, exposing people, especially children, to gun violence in their communities interferes with their ability to learn.[8]

Maryland's State parks, like its museums and schools, are regularly used for First Amendment activities, including a range of

---

[7] Reginald F. Lewis Museum of Maryland African American History & Culture, *Events Calendar*, https://tinyurl.com/mpkp2s8y (last visited Dec. 17, 2024).

[8] *Cf.* Cabral, *supra* note 5, at 1; Bergen-Cico, *supra* note 5, at 441.

festivals, celebrations, and educational experiences. These activities include:

| Date (2024) | Event | Location |
| --- | --- | --- |
| Feb. 3–4, Feb. 10–11, Feb. 17–18 Feb. 24–25 | Black History Month Celebration | Harriet Tubman Underground Railroad State Park |
| Mar. 9, Mar. 23 | STEM Like a Girl | Soldiers Delight Natural Environment Area (NEA) |
| April 21 | Pollinator Festival | Assateague State Park |
| April 22 | Earth Day Events | Throughout Maryland State Parks |
| April 22 | Colonial Market Fair | Fort Frederick State Park |
| May 25–26 | 100th Festival of Fort Frederick State Park | Fort Frederick State Park |
| June 15, July 14, July 20 | Es Mi Parque | Greenbrier State Park, Sandy Point State Park, Gunpowder Falls State Park |
| June 19 | Juneteenth Celebration | Harriet Tubman Underground Railroad State Park |
| June 27 | Great American Backyard Campout | Throughout Maryland State Parks |
| Aug. 24–25 | French & Indian War Muster | Fort Frederick State Park |
| Sept. 14–15 | Girl Scouts Love State Parks! | Select Maryland State Parks[9] |

---

[9] Md. Park Serv., *2024 Signature Events*, https://tinyurl.com/kf45tk8s (last visited Dec. 18, 2024).

Maryland is no outlier in this regard.  Public parks in the United States are traditional places of assembly and congregation.  As the Supreme Court and this Court have recognized, parks "have immemorially been held in trust for the use of the public and, time out of mind, have been used for the purposes of assembly, communicating thoughts between citizens, and discussing public questions."  *Warren v. Fairfax Cnty.*, 196 F.3d 186, 191 (4th Cir. 1999) (quoting *Hague v. C.I.O.*, 307 U.S. 496, 515 (1939)); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (describing parks as "quintessential public forums").  As such and as noted above, modern parks restricted firearms "[f]rom the outset," and "limits on arms in public parks was the norm in America in the era of the Fourteenth Amendment."  Cornell Decl. ¶¶ 56, 59.

Under *Bruen*, prohibiting firearms in courthouses, legislative assemblies, civic buildings, and analogous locations is well within the sphere of what governments can regulate without infringing on Second Amendment guarantees.  597 U.S. at 30.  Maryland's firearms restrictions at State parks, school grounds, museums, and in other appropriate and limited locations extend that same reasonable,

common-sense protection to other key venues for peaceable assembly. There is no principled reason the government can prohibit firearms at an event on the courthouse steps or in a legislative assembly, but be held powerless to regulate the same type of activity at a State park, at a museum, or on school grounds.  Indeed, such regulations, which reflect in part fundamental First Amendment concerns, are amply supported by longstanding history and tradition.

Construing the Second Amendment without the historical limitations acknowledged in *Bruen* collides directly with core First Amendment protections.  If more individuals or groups are allowed to carry guns in public places where people typically gather to exercise their rights of assembly and free speech, it will become more dangerous to peaceably assemble, organize, march, rally, and express ideas and beliefs in public settings.  *See* Gregory P. Magarian, *Conflicting Reports: When Gun Rights Threaten Free Speech*, 83 Law & Contemp. Probs. 169, 169 (2020) ("In the real world, … guns far more commonly impede and chill free speech than protect or promote it."); Mike McIntire, *At Protests, Guns Are Doing the Talking*, New York Times (Nov. 26, 2022), https://tinyurl.com/2b2wxxt5.  Those who have historically been

silenced may experience an especially intense chilling effect.  *See generally Armed Assembly: Guns, Demonstrations, and Political Violence in America*, Everytown Research & Policy (Aug. 23, 2021), https://tinyurl.com/4p2838f7; Darrell A. H. Miller et al., *Technology, Tradition, and "The Terror of the People,"* 99 Notre Dame L. Rev. 1373, 1401 (2024) (noting data suggest that people would be "less likely to visit public parks if firearm carry is allowed in such domains").[10]

In practice, the promise of First Amendment rights affords little assurance against hostile listeners bearing guns.  *See* David Welch, *Michigan Cancels Legislative Session to Avoid Armed Protesters*, Bloomberg (May 14, 2020), https://tinyurl.com/53e9unpz; Dahlia Lithwick & Mark Joseph Stern, *The Guns Won*, Slate (Aug. 14, 2017),

---

[10] Children have experienced this chilling effect when armed protestors have showed up at child-focused events and places.  *See, e.g.*, Tolly Taylor, *I-Team: Parents Concerned About Man With Assault Rifle at School Bus Stop*, WBALTV (May 18, 2023), https://tinyurl.com/4bybns4d (describing increased police presence at school bus stops to "alleviate fear and anxiety" related to a man repeatedly seen carrying an AR-15 rifle at such a stop in Anne Arundel County, Maryland); Christopher Wiggins, *Proud Boys Terrorize Drag Queen Story Hour in Nevada*, Advocate (June 30, 2022), https://tinyurl.com/yfweb46m ("A member of the Proud Boys approached [a] group of children at a public library [in Nevada] with a rifle, causing them to scatter and scream.").

https://tinyurl.com/2zetvdwv ("When the police are literally too afraid of armed protesters to stop a melee, First Amendment values are diminished; discussion is supplanted by disorder and even death ....").

The problem is exacerbated in an increasingly polarized society. *See* Bertrall L. Ross II, *Polarization, Populism, and the Crisis of American Democracy*, 20 Ann. Rev. L. & Soc. Sci. 293, 295–96 (2024) (observing "rise of mass-level political polarization"); Tori Luecking, *DHS Launches Panel on Religious Security as Hateful Incidents Rise*, Wash. Post (Nov. 3, 2022), https://tinyurl.com/2m4rcanv ("FBI hate crime statistics show that incidents in churches, synagogues, temples and mosques increased 34.8 percent between 2014 and 2018"). Substantial experience and scientific research make clear that firearms are an unlikely antidote to the strife and polarization of our age. When carried in public, they magnify the risk of violence where calm, peace, and order are necessary for an atmosphere conducive to a reasonable exchange of viewpoints.

To preserve our democracy through peaceful civil engagement, states must be able to appropriately regulate firearms in modern First Amendment-protected spaces. Accordingly, this Court cannot

reasonably conclude that the Framers of the Second and Fourteenth Amendments meant to create a right to bear arms that would overwhelm and defeat First Amendment rights of free speech, free exercise of religion, peaceable public assembly, the ability to petition the government for redress of grievances, and freedom of the press to report on public events. There is no evidence that the Framers would have countenanced such an imbalance in our constitutional protections. They meant for our communities to be empowered to protect core individual constitutional rights from the obvious threats posed by the potential for gun violence, intimidation, and other misuse of firearms in parks, museums, and other civic forums. With the legislation and regulations at issue, Maryland has done so in a manner that is fully consistent with the Second Amendment.

# CONCLUSION

The judgment of the district court should be affirmed in part (as to upholding firearms restrictions in sensitive places) and reversed in part (as to enjoining firearms restrictions).

Respectfully submitted,


/s/ *Kelly M. Percival*

Kelly M. Percival
GIFFORDS LAW CENTER TO
  PREVENT GUN VIOLENCE
268 Bush Street #555
San Francisco, CA  94104
(415) 433-2062

*Counsel of Record for Amicus Curiae Giffords Law Center to Prevent Gun Violence*

*/s/Thomas M. Bondy*

Thomas M. Bondy
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
(202) 339-8400

*Counsel of Record for Amicus Curiae Brady Center to Prevent Gun Violence*

Esther Sanchez-Gomez
GIFFORDS LAW CENTER TO
  PREVENT GUN VIOLENCE
268 Bush Street #555
San Francisco, CA  94104
(415) 433-2062

*Additional Counsel for Amicus Curiae Giffords Law Center to Prevent Gun Violence*

Douglas N. Letter
Shira Lauren Feldman
Tess M. Fardon
BRADY CENTER TO PREVENT GUN
  VIOLENCE
840 First Street, N.E., Suite 400
Washington, DC 20002

Melanie R. Hallums
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY  10019

Holly J. Boux*
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
*\* Not licensed in the District of Columbia; practice is under the supervision of bar members pursuant to D.C. App. R. 49(c)(8).*

*Additional Counsel for Amicus Curiae Brady Center to Prevent Gun Violence*

December 27, 2024

36

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 6,340 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/Thomas M. Bondy*
Thomas M. Bondy
*Counsel for Amicus Curiae Brady Center to Prevent Gun Violence*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on December 27, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

ORRICK, HERRINGTON & SUTCLIFFE LLP

/s/ *Thomas M. Bondy*
Thomas M. Bondy
*Counsel for Amicus Curiae Brady Center to Prevent Gun Violence*